IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NANCY STEPRO, | ) | Case No. 1:16-cv-569 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

**I.      Introduction**

Plaintiff, Nancy Stepro ("Stepro"), seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be AFFIRMED.

## II.      Procedural History

Stepro protectively[1] filed an application for SSI on November 8, 2012, alleging a

disability onset date of November 5, 2012.  (Tr. 158-68, 178)  Stepro alleged disability based on

asthma and chronic obstructive pulmonary disease ("COPD"). (Tr. 182)  Stepro's application

was denied initially on February 26, 2013 (Tr. 107, 131-34) and upon reconsideration on June 3,

2013.  (Tr. 117, 135-36)  Thereafter, Stepro requested a hearing on June 12, 2013.  (Tr. 137)  A

hearing before administrative law judge Frederick Andreas took place on October 2, 2014.  (Tr.

75-106)  On January 27, 2015, the ALJ denied Stepro's claim for benefits.  (Tr. 59-72)  The

Appeals Council denied review of that decision on February 4, 2016, rendering the ALJ's

January 27, 2015 decision the final decision of the Commissioner.  (Tr. 1-6)

## III.     Evidence

### A.      Personal, Educational, and Vocational Evidence

Stepro was 53 years old on the date of the hearing.  (Tr. 80)  She had a ninth grade

education.  (Id.)  Her past work experience included work as a laborer, housekeeper (also

referred to as a cleaner), and packager at a nut company.  (Tr. 80, 101, 189)

### B.      Medical Evidence

#### 1.      2012 Medical Encounters

On November 6, 2012, Stepro was seen at the emergency department ("ED") of

Marymount Hospital due to shortness of breath, which was characterized as a "new problem."

(Tr. 235, 237)  She reported that she had not seen a doctor for a long time and was not compliant

---

[1] Protective filing is a Social Security term for the first time one contacts the Social Security Administration to file a claim for disability or retirement. Protective filing dates may allow an individual to have an earlier application date than the actual signed application date. This is important because protective filing often affects the entitlement date for disability and retirement beneficiaries along with their dependents.  http://www.ssdrc.com/disabilityquestionsmain20.html (Last visited 12/13/16).

with medication. (Tr. 252) Stepro also disclosed that she smoked more than a half a pack of cigarettes a day. (Id.) Steroids and other treatments were administered in the ED but Stepro's breathing was reportedly still tight. (Tr. 235, 240) Stepro demonstrated a normal range of motion. (Id.) Thereafter, she was admitted for exacerbation of COPD, asthma, and bronchitis. (Tr. 236) She was discharged on November 10, 2012, with diagnoses of acute asthma exacerbation; possible COPD; smoking; and morbid obesity. (Tr. 254) It was noted that she stated she was "breathing better" and that during the four-day hospital stay she was down to smoking 4 cigarettes a day. (Tr. 254-55) She was described as showing "marked improvement" at the time of discharge. (Tr. 256) She was prescribed numerous pulmonary medications but, having no insurance, did not fill the prescriptions. (Tr. 307)

On November 12, 2012, Stepro presented to Neon for COPD follow-up. (Tr. 284-85) She reported that her symptoms are aggravated by mild activity and smoking. (Tr. 284) She was prescribed Chantix, a smoking cessation aid. (Tr. 285) On December 20, 2012, Stepro called MetroHealth complaining of shortness of breath. (Tr. 298) She stated that she was given prescriptions for a nebulizer and medication from Marymount but did not have insurance. She was seen at MetroHealth on December 27, 2012. (Tr. 299-00, 307-08). She stated that she had not used her prescribed pulmonary medications for six weeks because of a lack of insurance and disclosed that she currently smoked two cigarettes a day. A physical examination revealed no respiratory distress and a moderate amount of coughing. (Tr. 300, 308) Stepro was diagnosed with mild to moderate persistent asthma. (Id.) She was treated with a spacer and provided meter dose inhalers. (Id.)

### 2.      2013 Medical Encounters

On February 26, 2013, Stepro returned to MetroHealth for an examination by Jessica Griggs, D.O.  (Tr. 302-04)  Stepro reported shortness of breath and wheezing when walking short distances.  (Tr. 302)  Dr. Griggs noted good breath sounds with a few wheezes.  (Tr. 303)  She diagnosed Stepro with mild persistent asthma.  (Tr. 304)

At the request of the Division of Disability Determination, Stepro underwent a pulmonary function study on May 15, 2013.  (Tr. 332-40)  The physician interpretation indicated that the evaluation was valid and the test results represented a "moderate severe obstruction."  (Tr. 335)  The reported listed Stepro as a non-smoker.  (Tr. 336)

On June 6, 2013, Stepro returned to MetroHealth complaining of shortness of breath and wheezing.  (Tr. 350)  Later in the month, Stepro was counseled on smoking cessation.  (Tr. 357)  At both June visits, Dr. Griggs' noted that Stepro's breathing sounds were normal with no wheezes, rales, or rhonchi.  (Tr. 351)  Mild persistent asthma was listed as Stepro's diagnosis.  (Tr. 353)

On June 19, 2013, Stepro underwent a pulmonary function test conducted by James Finley, M.D.  (Tr. 357)  Dr. Finley opined that Stepro had "moderately severe obstructive ventilatory impairment" with reduced diffusion capacity.  (Tr. 358)  Dr. Finley concluded that the test findings were consistent with a diagnosis of COPD.  (Id.)

In July 2013, Stepro returned to Dr. Griggs complaining of shortness of breath.  (Tr. 387-91)  She stated that her inhalers were not working and requested a nebulizer.  (Tr. 388)  She also reported a sleep-related choking sensation.  (Tr. 392)  Dr. Griggs ordered a sleep study (Tr. 391-92).    Dr. Griggs prescribed a nebulizer and administered a breathing treatment.  (Tr. 387-89).  Dr. Griggs also diagnosed Stepro with chronic airway obstruction, not elsewhere classified.  (Tr.

4

391)  Two months later, Stepro again complained of shortness of breath and also complained of

chest tightness.  (Tr. 405)  Dr. Griggs requested pulmonary services on behalf of Stepro and

provided her with a disability placard.  (Tr. 407)

On October 26, 2013, Stepro underwent a third pulmonary function test.  (Tr. 419-23)

The test was conducted at MetroHealth by Sherrie D. Williams, M.D.  (Id.)  Dr. Williams opined

that the test results showed a moderate obstructive ventilatory impairment and determined that

there had been no significant change compared to Stepro's previous pulmonary function testing.

(Tr. 419)  Dr. Williams also noted that Stepro had a "significant response to bronchodilator

therapy."  (Id.)  And he found: "total lung capacity is increased showing hyperinflation,

Functional residual capacity is increased, Expiratory reserved volume is reduced, Residual

volume is increased, Vital Capacity is normal and RV/TLC is increased consistent with air

trapping."  (Id.)  Finally, he stated "This patient may be a candidate for Pulmonary

Rehabilitation."  (Id.)

In November 2013, Stepro attended the Asthma Clinic per Dr. Griggs' recommendation.

(Tr. 433-42)  Stepro reported at that time that she smoked five cigarettes a day.  (Tr. 434)  She

was instructed to quit smoking.  (Tr. 439, 441)  A physical examination showed diminished but

clear lungs, no wheezing, and no evidence of consolidation.  (Tr. 437)  Stepro was diagnosed

with moderate COPD and severe, persistent, poorly-controlled asthma.  (Tr. 441)

### 3.    2014 Medical Encounters

On January 8, 2014, Dr. Griggs reported that Stepro told her that she had "few wheezes"

and was taking her medication daily.  (Tr. 456)  No abnormalities were noted in Stepro's

February 2014 visit to Dr. Griggs.  (Tr. 487)  On March 7, 2014, Stepro returned to the Asthma

Clinic.  (Tr. 490-97)  It was reported that Stepro had quit smoking two days prior.  (Tr. 493)  A

physical examination revealed a few scattered rhonchi and no evidence of effusion or

consolidation.  (Id.)  Based on a pulmonary function test conducted that same day, Michael D.

Infeld, M.D. opined that the test results "demonstrate an improved, partially reversible moderate

ventilatory impairment that is most consistent with grade A or C COPD."  (Tr. 499)  Dr. Infeld

also noted "significant improvement" in FVC[2] by 19% since the October 2013 examination.

(Id.)

In April 2014, Stepro presented to Marymount Hospital with complaints of right leg

pain and difficulty ambulating due to the pain.  (Tr. 535)  Stepro did not complain of any

respiratory symptoms and her physical examination showed no signs of respiratory distress.  (Tr.

540).  A November 21, 2014, examination revealed muscle tightness with normal motor strength.

(Tr. 558)  Stepro reported pain on various physical testing, including seated and standing flexion

tests.  (Id.)

### C.    Opinion Evidence

#### 1.    Treating Physician – Dr. Griggs

Dr. Griggs completed a Medical Source Statement ("MSS") on Stepro's behalf which

was signed on August 22, 2014.  (Tr. 395-97)  Dr. Griggs listed Stepro's diagnoses as severe

persistent asthma, COPD, gastroesophageal reflux disease, allergic rhinitis, and low back pain.

(Tr. 395)  Dr. Griggs indicated that shortness of breath, wheezing, and pain supported Stepro's

diagnoses.  (Id.)  Dr. Griggs opined that Stepro could lift no more than 10 pounds frequently and

occasionally; could stand and/or walk for 60 minutes in an 8 hour work day, could sit for 1-2

hours in an 8 hour work day; and needed to take 30 minute sitting breaks every 10-15 minutes

---

[2] FVC (forced vital capacity) is the volume of air that can be maximally forcefully exhaled.
https://www.med.umich.edu/intmed/allergy/edu/syllabus/TOPICS/PFTs/pft.htm (last visited December
13, 2016)

due to her history of asthma.  (Tr. 396)  Dr. Griggs further opined that Stepro would be off task

for 60% of the day and would miss more than four days per month due to problems with her

back and her breathing.  (Tr. 397)  Dr. Griggs also determined that temperature fluctuations,

chemical fumes, smoke, and humidity would cause a flare up of her asthma and COPD.  (Id.)

### 2.       State Agency Consultant – Dr. Lewis

On February 25, 2013, state agency consultant Bradley J. Lewis, M.D. reviewed Stepro's

claim file and completed a residual functional capacity assessment.  (Tr. 111-114)  Dr. Lewis

determined that Stepro's statements regarding her symptoms were partially credible.  (Tr. 112)

He noted that while she complained of shortness of breath on occasion, her last exam revealed an

$SpO2^3$ of 100% and clear lungs.  (Id.)   He opined that Stepro was capable of lifting 50 pounds

occasionally, 25 pounds frequently; standing and/or walking 6 hours in an 8 hour work day;

sitting 6 hours in an 8 hour work day; frequently climbing ramps/stairs; occasionally climbing

ladders/ropes/scaffolds, and should avoid concentrated exposure of extreme cold, extreme heat,

humidity, fumes, odors, dusts, gases, poor ventilation.  (Tr. 112-13)

### 3.       State Agency Consultant – Dr. Torello

Lynne M. Torello, M.D., state agency consultant, reviewed Stepro's claim file on June 5,

2013.   (Tr. 123-27).   Dr. Torello opined that Stepro was capable of lifting 20 pounds

occasionally;   10   pounds   frequently;   could   occasionally   climb   ramps/stairs   and

crouch/kneel/stopper but could never climb ladders/ropes/scaffolds.   Dr. Torello adopted the

same stand/walk, sitting, and environmental limitation as Dr. Lewis, except that Dr. Torello also

added that Stepro should also avoid concentrated exposure to noise due to a reported hearing

---

[3] SpO2 is "The saturation of arterial blood with oxygen as measured by pulse oximetry, expressed as a percentage." http://medical-dictionary.thefreedictionary.com/Spo2 (last visited December 13, 2016).

problem.  (Tr. 124)  In support of her conclusion, Dr. Torello cited to various medical records showing normal respiratory testing.  (Tr. 124, 126)  She ultimately determined that Stepro had the capacity for light work and was not disabled.  (Tr. 127)

**D.     Testimonial Evidence[4]**

Stepro testified that she had been treating with Dr. Griggs for 3-4 years prior to the hearing.  (Tr. 82)  The ALJ questioned Stepro about a handwriting discrepancy he noticed on Dr. Griggs' statement – a difference between the signature versus the text (i.e. a difference in the letter G's and how the letters lean).  (Tr. 82-83)  The ALJ asked Stepro to explain the perceived discrepancy.  (Tr. 83)  Stepro responded that she dropped the form off at the records department of MetroHealth and she did not know who filled out the form.  (Id.)

Stepro testified that she last worked as a packer for King Nut in Solon.  (Tr. 84-85)  She stated that she was terminated from that position for missing work on a mandatory Saturday.  (Tr. 85)  She stated that she missed work due to a transportation issue.  (Id.)  The ALJ then asked why Stepro chose November 5, 2012, as her disability date.  (Id.)  Stepro responded that while she was hospitalized at Marymount in November 2012, the doctor mentioned that maybe she should "sign up for Social Security."  (Id.)  The ALJ then questioned Stepro as to what she did between October 2010, when she left King Nut, and November 2012 when she filed for disability.  (Id.)  Stepro responded "Nothing really…I mean spending time with my grandkids, you know, sometimes I'd watch them…[u]sually on the weekends."  (Id.)

Stepro was then examined by her counsel.  During that examination, she testified that she experienced problems with shortness of breath and could not walk for longer than 10 minutes.  (Tr. 86)  She stated that after walking for 10 minutes she had to sit and rest about 30 minutes

---

[4] Vocational Expert Ted Macy also testified at the hearing.  (Tr. 97-105)  However, since Stepro's appeal does not relate to Mr. Macy's testimony, the testimony will not be summarized herein.

before getting up again.  (Tr. 87)  She testified that cold and hot air negatively impacted her breathing.  (Id.)  She also stated that she did not feel comfortable lifting anything heavier than 8 pounds.  (Id.)  Stepro's counsel pointed out that she was using a cane at the hearing.  (Tr. 89)  Stepro stated that she started using a cane three or four months prior to the hearing after Dr. Griggs prescribed its use.  (91)  She asserted that she used the cane because her legs "are starting to give out on me" due to sciatica.  (Tr. 90)  Stepro stated that she started having problems with her legs a few years before the hearing.  (Tr. 90-91)

Stepro testified that she did not drive and performed some housework but was unable to stand longer than 10 minutes.  (Tr. 92)  After standing for 10 minutes, Stepro testified that she had to sit down and rest for about 30 minutes before standing up again.  (Tr. 92-93)  Stepro asserted that she used her inhaler two to three times a day usually after walking.  (Tr. 93)

The ALJ then questioned Stepro again.  Stepro testified that she smoked two cigarettes a day.  (Tr. 95)  She also testified that she was referred to a sleep apnea clinic but had not gone yet.  (Tr. 96)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do  his  previous  work  but  cannot,  considering  his  age,  education,  and  work

experience, engage in any other kind of substantial gainful work which exists in the national economy[5]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

---

[5] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

**IV. The ALJ's Decision**

The ALJ issued a decision on January 27, 2015.  A summary of his findings are as follows:

1. Stepro had not engaged in substantial gainful activity November 8, 2012, the application date.  (Tr. 64)

2. Stepro has the following severe impairments:  chronic obstructive pulmonary disease (COPD); asthma; hearing impairment; and obesity.  (Tr. 64)

3. Stepro does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  (Tr. 64)

4. Stepro has the residual functional capacity ("RFC") to perform light work except she must never climb ladders, ropes or scaffolds; no more than occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; able to understand conversational voice but must avoid loud environments; must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards (such as working around dangerous moving machinery).  (Tr. 65)

5. Stepro is capable of performing her past relevant work as a cleaner.  This work does not require the performance of work-related activities precluded by the claimant's RFC.  (Tr. 69)

Based on these findings, the ALJ determined that Stepro had not been under a disability since November 8, 2012, the date the application was filed.  (Tr. 69)

**VI.  Law & Analysis**

    **A.  Standard of Review**

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

11

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."  *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough

12

evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.    Credibility Argument

Stepro first contends that the ALJ failed to conduct a proper assessment of her credibility. ECF Doc. No. 13, Page ID# 634-35.  Stepro argues that the ALJ failed to review the credibility factors outlined in Social Security Ruling 96-7p and only relied on two insufficient reasons for finding her testimony less than credible:  (1) that she stopped working due to reasons other than her disability and (2) that she did not smoking despite her disability and her doctor's recommendation to completely cease.  Id. at Page ID# 635.  The Commissioner vigorously disagrees with plaintiff's credibility argument, asserting that the ALJ was required by SSR 97-7p to discuss other factors that may have contributed to plaintiff's unemployment, and was required to consider both the objective medical evidence and other evidence, including prior work history. ECF Doc. No. 15, Page ID# 653.  The Commissioner also asserts that the ALJ was reasonable in considering Stepro's continued cigarette smoking despite medical advice to quit as he evaluated the severity of her alleged symptoms.  Id. at Page ID# 653-54.  The Commissioner also points out that Stepro had received only conservative treatment for her allegedly disabling impairments,

13

having been managed almost exclusively by medication for her respiratory symptoms.  Id.
Finally, the Commissioner points to the numerous record references cited by the ALJ – which
indicated that indicated plaintiff's physical examinations and testing demonstrated few
abnormalities – as a proper ground for not according her claims of impairment full credibility.
Id.

An ALJ's credibility determination is entitled to great deference because the ALJ has the
"unique opportunity to observe" the witness's demeanor while testifying. *Buxton,* 246 F.3d at
773; *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 476; *Walters v. Commissioner of
Social Sec.,* 127 F.3d 525, 531. On appeal, a reviewing court is "limited to evaluating whether or
not the ALJ's explanations for [discrediting the witness] are reasonable and supported by
substantial evidence in the record." *Jones,* 336 F.3d at 476.  For the reasons that follow, the
ALJ's explanations for finding that Stepro's statements less than fully credible were reasonable
and supported by substantial evidence.

Stepro implies that it was improper for the ALJ to consider in his credibility assessment
(1) that she stopped working due to reasons other than her disability and (2) that she failed to quit
smoking.  Stepro provides no authority to support her assertion that these are not proper reasons
to "question the veracity of Ms. Stepro's complaints."  ECF Doc. No. 13, Page ID# 635.
Contrary to Stepro's assertion, there is authority holding that these are proper factors to consider
in making a credibility judgment.

As to the smoking issue, Stepro was warned on a number of occasions by her doctors to
stop smoking but continued to smoke, albeit at a reduced rate.  The ALJ stated that he recognized
and took into consideration the "difficulty of smoking cessation" but stated that "it remains
exceptionally difficult to reconcile continued smoking with allegations of respiratory difficulty

14

so significant as to preclude basic work activities." (Tr. 67) "The Sixth Circuit has repeatedly held that a claimant's continued smoking militates against the credibility of his disabling breathing order." *Siler v. Astrue*, No. CIV.A. 11-391-DLB, 2012 WL 2603656, at *7 (E.D. Ky. July 5, 2012) *citing Brown v. Social Security Administration,* 221 F.3d 1333, at *1 (6th Cir.2000) (table); *Ninness v. Sec'y of Health & Humans Servs.,* 884 F.2d 580, at *3 (6th Cir.1989); *Auer v. Sec'y of Health & Human Servs.,* 830 F.2d 594, 595 (6th Cir.2987); *Sias v. Sec'y of Health & Human Servs.,* 861 F.2d 475, 480 (6th Cir.1988). Therefore, Stepro's continued smoking was a legitimate consideration for the ALJ's credibility determination.

The fact that Stepro stopped working for reasons other than her disability was also appropriately considered by the ALJ in his credibility assessment. *See e.g., Nassar v. Colvin*, No. CV 15-10683, 2016 WL 398248, at *5 (E.D. Mich. Jan. 27, 2016), *report and recommendation adopted sub nom. Nassar v. Comm'r. of Soc. Sec.,* No. 15-10683, 2016 WL 787131 (E.D. Mich. Feb. 29, 2016) (finding that it was proper for the ALJ to consider in the credibility determination the fact that the claimant had stopped working several years prior for reasons unrelated to her medical impairment); *McDonald v. Comm'r. of Soc. Sec.,* No. 13–12312, 2014 WL 1922790, at *13 (E.D.Mich. May 14, 2014) (upholding the ALJ's credibility determination in part because "[t]he ALJ further properly noted that there is evidence that the claimant stopped working for reasons not related to the allegedly disabling impairments." (Internal quotation marks omitted.); *Maxwell v. Astrue,* No. CIV.A 09–231–DLB, 2010 WL 1418725, at *3 (E.D.Ky. Apr. 7, 2010) ("Furthermore, the ALJ found that the Plaintiff has never worked, which raises questions about whether her current unemployment is a result of her medical problems."); *Noble v. Colvin,* No. 5:12–CV–329–JMH, 2013 WL 3771496, at *6 (E.D.Ky. July 17, 2013) (legitimate factors for discounting credibility included "the fact that

15

claimant has never worked, raising questions as to whether her current unemployment is truly the result of medical problems.").

Stepro also mischaracterizes the ALJ's decision by arguing that the ALJ relied only on her continued smoking and work history in finding her allegations not fully credible.  Contrary to Stepro's assertion, the ALJ supported his credibility determination with more than these two reasons.  The ALJ also stated that in determining that Stepro was "not fully credible" he took into account "various factors, including the objective medical evidence, medical treatment, medication taken, comments regarding the claimant's activities of daily living, work history, and opinions." (Tr. 66)  The ALJ noted that "objective diagnostic testing…[wa]s not supportive of the intensity, persistence, and limiting effects of the symptomology alleged by the claimant." (Id.)  As the ALJ pointed out, "other than sporadic notation of wheezing and decreased breath sounds, the claimant is routinely reported as retaining normal respiratory effort, normal oxygen saturation levels, and being without decreased breath sounds or rales." (Tr. 67)  The ALJ also explained that "pulmonary function testing found no more than 'moderate' obstruction and 'significant improvement' with use of bronchodilator therapy." (Id.)

Based on the foregoing, the undersigned finds that the ALJ provided   specific explanations for his credibility finding, supported by substantial evidence in the record. Under such a circumstance, the court has no basis upon which to disturb the ALJ's credibility finding. *See Buxton,* 246 F.3d at 773.

### C.    Treating Physician Argument

Stepro next argues that the ALJ's failure to give controlling weight to her treating physician, Dr. Griggs, requires the conclusion that the ALJ's determination that plaintiff could perform light work was not supported by substantial evidence.  ECF Doc. No. 13, Page ID# 636-

39.  Stepro asserts that even if there was a basis not to accord Dr. Griggs' opinions controlling weight, the ALJ did not provide "good reasons" for making that decision, as required by the regulations.  The Commissioner counters that the ALJ's conclusions that the objective evidence did not support Dr. Griggs' opinion and that the other medical opinions were more consistent with the clinical findings constituted "good reasons" for assigning less weight to Dr. Griggs' opinion., .  ECF Doc. No. 15, Page ID# 650-52.

Social Security Administration regulations dictate how medical opinions must be weighed.  20 C.F.R. § 404.1527(c).  In general, the regulations require that an opinion from a medical source who has examined a claimant be given more weight than opinions from a source who has not performed an examination; and an opinion from a medical source who regularly treats the claimant is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship. *id.* § 404.1502, 404.1527(c)(1)&(2). *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." *Id. citing* Social Security Rule No. 96–6p, 1996 WL 374180, at *2 (July 2, 1996).

If treating source opinions are (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. 20 C.F.R. §404.1527(d)(2); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009).  If the treating source opinion is not given controlling weight, then the ALJ must apply several factors in determining the weight to give the opinion including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or

17

contradict the opinion. 20 C.F.R. § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart,* 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)). These requirements are referred to as the treating physician rule.

  "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544–45 (6th Cir. 2004) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999)) (internal quotations omitted). Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record." *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007) (emphasis added)). However, although the regulations instruct an ALJ to consider various factors, they expressly require only that the ALJ's decision include "good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2).

  Dr. Griggs provided a medical source statement ("MSS") in 2014 opining that Stepro could lift no more than 10 pounds; stand/walk only 60 minutes in an 8 hour work day, sit 1 to 2

hours in an 8 hour work day.  ECF Doc. No. 13, Page ID# 637; (Tr. 396)  Dr. Griggs further

opined that Stepro would be off task 60% of the work day and would be absent from work four

times per month.  ECF Doc. No. 13, Page ID# 637. (Tr. 396-97)  The ALJ afforded "little to no

weight" to Dr. Griggs' 2014 MSS, stating:

> [The] MSS is found to be inconsistent with the weight of the record (Exhibit 7F).  For
> example, Dr. Griggs opines that the claimant is only able to sit for one to two hours a day
> in an eight hour day; however, there is little, if any, objective evidence that the claimant
> has difficulty sitting.  Moreover, the undersigned finds Dr. Griggs' MSS to be internally
> inconsistent.  For example, Dr. Griggs opined that the claimant needs a break every 10-15
> minutes, whereby she needs to sit quietly for 30 minutes.  Said breaks and necessitated
> sitting would appear to indicate a _much_ more significant sitting ability than the two hours
> per eight hour workday opinion by Dr. Griggs.  Finally, while not dispositive, there is a
> significant discrepancy as to the handwriting of the person filling out said MSS, as
> printed handwriting and Dr. Griggs signature appear distinctly dissimilar (the "g's" from
> the words in questions 8i and 9 of said MSS ("breathing" and "long" respectively) when
> compared to Dr. Griggs printed signature), which would indicate that Dr. Griggs did not
> complete said MSS.  Said abnormalcy as to the handwriting would explain the
> _conspicuous_ discrepancy between the doctor's more or less disabling opinion and the
> overall normalcy of the claimant's objective record.  Consequently, little to no weight is
> afford Dr. Griggs' MSS.

(Tr. 68).

Initially, a treating physician's opinion must be afforded controlling weight if it is (1)

"well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"not inconsistent with the other substantial evidence in [the] case record."  Here, the ALJ

expressly asserted that Dr. Griggs' MSS was inconsistent with other substantial evidence in the

record.  The ALJ also found Dr. Griggs' MSS was not well-supported (e.g., "little, if any,

objective evidence that the claimant has difficulty sitting.").  The court's own examination of the

record evidence backs up this conclusion; there is virtually no evidence in the medical record

supporting the conclusion that Ms. Stepro cannot sit for extended periods.  Having made an

appropriate examination of the consistency between the record evidence and the treating source

opinion, the ALJ was not obligated to give controlling weight to the opinion.  Next it must be

19

determined whether the ALJ provided "good reasons" for affording the MSS less than controlling weight.

The ALJ asserted that the Dr. Griggs' MSS was inconsistent with the weight of the record.  As an example, the ALJ contended that that there was "little, if any, objective evidence that claimant had difficulty sitting."  (Tr. 68)  The ALJ's assertion is consistent with the record evidence and Stepro has not pointed to any evidence to counter the ALJ's assertion.  In April 2014, Stepro was seen for sciatic pain for the first time.  (Tr. 539)   It was reported at that time that she had a normal range of motion and had tried nothing for her symptoms.  (Tr. 539-40)  In November 2014, she reported that her legs "give out" on her at times but no sitting or other concerns were noted.  (Tr. 565)  It was also reported that she could only stand for about 20 minutes before sitting due to pain but there were no reports that she had problems once seated. (Tr. 554)  Based on all of the above, the ALJ's determination that there was no objective evidence in the record that claimant had difficulty sitting was supported by substantial evidence and, therefore, was a "good reason" for discounting Dr. Griggs' MSS.

Although the ALJ only gave one example where the weight of the record was inconsistent with the MSS, in other parts of the ALJ's decision he further explained the inconsistency.  (Tr. 68)  The ALJ noted that clinical visits and objective findings were routinely benign in nature.  (Tr. 67)  The ALJ cited to numerous medical records demonstrating normal respiratory effort, normal oxygen saturation levels, and no decreased breath sounds or rales.  (Id.) The ALJ stated that since Stepro's November 2012 hospitalization she had not needed inpatient care.  (Id.)  The ALJ also pointed out that pulmonary function testing revealed no more than moderate obstruction with "significant improvement" with use of bronchodilator therapy.  (Id.) One implication of the ALJ's citation to "significant improvement" with therapy is that Stepro's

20

condition evolved during the period between November 2012 and 2014 when the last pulmonary function study was conducted.  Nothing in Dr. Griggs' opinion appears to address this; instead, she gave "a more or less disabling opinion" despite the "overall normalcy of the claimant's objective record."  (Tr. 68)

Instead of responding to the ALJ's findings, Stepro asserts that there is objective evidence to support Dr. Griggs' opinion including periodic notes of wheezing and diminished breath sounds and FEV1 results between 57-69%.  ECF Doc. No. 13, Page ID# 638.  As to the FEV1 test results, Stepro cites to no medical evidence that correlates these test data with the severe functional restrictions opined by Dr. Griggs.  Moreover, the results of a pulmonary function test completed one week prior to Dr. Griggs' MSS, reported that there was a "significant improvement in FEV1 and FVC" and noted that there had been a "significant response to bronchodilator therapy."  (Tr. 67, 419)  That same record, under the heading "Lung Volumes" states: "functional residual capacity is increased."  Apparently, as noted by the ALJ, Stepro's lung capacity was improved with treatment.

Even if Stepro had cited evidence supportive of Dr. Griggs' opinions, the "[f]indings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted).  The undersigned finds that the ALJ's determination that Dr. Griggs' MSS was inconsistent with the record evidence is supported by substantial evidence, and Stepro's reference to her own lay interpretations of her pulmonary function studies does not mandate a contrary conclusion.

21

The ALJ also found that Dr. Griggs' MSS was internally inconsistent.  Dr. Griggs opined that Stepro needed a break every 10-15 minutes in order to sit quietly for 30 minutes but also asserted that Stepro could sit no more than 1-2 hours a day in total.  As the ALJ pointed out, this is internally inconsistent.  If Stepro had to sit every 10-15 minutes for 30 minutes at a time, in an 8-hour day she would be sitting far longer than 2 hours a day.  Stepro does not provide any evidence or argumentation to explain this internal inconsistency.

Finally, the ALJ also gave "great weight" to the opinion of Dr. Torello who opined that Stepro was capable of light work.  (Tr. 68)  The ALJ noted that Dr. Torello's opinion was well-supported including notations to specific medical testing considered in the record.  (Id.)  The ALJ also stated that the record lacked specific objective documentation that would support greater limitations than those opined by Dr. Torello.  State agency consultants are "highly qualified physicians, psychologists, and other medical specialists." *Id.* "Generally, the more consistent an opinion is with the record as a whole, the more weight we will give that opinion." 20 C.F.R. § 416.927(c)(4)  The ALJ gave more weight to Dr. Torello's opinion because it was more consistent and provided adequate support for the conclusions expressed.  20 C.F.R. §§ 416.927(e).  (ALJs should consider factors such as the nature of the relationship, supportability, consistency, and other factors).

For all of the reasons mentioned above, substantial evidence in the record supports the ALJ's determination to afford Dr. Griggs' opinion "little to no weight."  The ALJ reasonably found that Dr. Griggs' opinion was not well-supported by evidence in the record and was inconsistent with other evidence in the record.  The undersigned finds that the ALJ provided "good reasons" for providing less weight to Dr. Griggs' opinion, and supported those reasons by

substantial evidence in the record.  Accordingly, the undersigned recommends the ALJ's

decision be affirmed.[6]

## VII.  Conclusion

For the foregoing reasons, I find that Stepro has not demonstrated a basis upon which to

reverse or remand the Commissioner's decision.  For these reasons, I recommend that the final

decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §405(g).


Dated: December 14, 2016

Thomas M. Parker

United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  See
*U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985),
reh'g denied, 474 U.S. 1111 (1986).

---

[6] Stepro also argued that the ALJ had a mandatory duty to contact Dr. Griggs to verify the accuracy of her
opinion regarding the handwriting discrepancy.  ECF Doc. No. 13, Page ID# 639.  However, this
argument need not be addressed because the ALJ stated that this issue was not dispositive and provided
other sufficient reasons for discounting Dr. Griggs' opinion in addition to the handwriting discrepancy.
Moreover, Stepro cites no authority in support of her argument that such a duty is mandatory.

23